Criminal Case No. 03-cr-00582-REB
(Civil Action No. 07-cv-01921-REB)

UNITED STATES OF AMERICA,

      Plaintiff-Respondent,

v.

DAVID LEROY HARTMAN,
      Mr. Hartman.

_____

**FINAL ORDERS RE: DEFENDANT'S MOTION**
**UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE**
**BY A PERSON IN FEDERAL CUSTODY**
_____

Blackburn, J.

      This matters is again before me on the **Motion under 28 U.S.C. § 2255 To**

**Vacate, Set Aside, or Correct  Sentence by a Person in Federal Custody** [#129][1]

filed September 10, 2007, by the defendant-movant (Mr. Hartman).  I deny the claim of

Mr. Hartman for ineffective assistance of counsel and reiterate and homologate my

extant denial of the balance of the motion to vacate.

## BACKGROUND[2]

      On June 23, 2003, Frank Gassman, who had been a policeman in Denver,

Colorado, for approximately 25 years and a narcotics detective for the previous 19

_____

[1] "[#129]" is an example of the convention I use to identify the docket number assigned to a specific paper by the court's electronic case filing and management system (CM/ECF). I use this convention throughout this order.

[2] This is essentially a reiteration of the facts I noted in my amended order [#162] entered October 4, 2010.

years, Trial Transcript [#117 at 20-21], received information from a confidential informant, which information led to the arrest of Mr. Hartman in the instant case. Detective Gassman had worked with this particular confidential informant for "around four or five years," during which time the informant had never provided false information but had provided "probably a hundred" tips, of which "30 or 40" had led to arrest, search warrants or further investigation." [*Id.* at 49-50, 69]. On this occasion, the confidential informant made multiple telephone calls to Detective Gassman [*id.* at 70, 72] in which the detective was informed that an individual, known to the informant as "David," (1) was involved in the distribution of methamphetamine; (2) was in possession of a .357 caliber handgun; (2) was driving around in a small red car with a broken windshield and broken side window; (3) was using identification under the name of Jeffrey Meehan; and (4) was wanted on an outstanding warrant for escape. [*Id.* at 49-50]. The confidential informant described "David" in detail:  a white male, 40 to 45 years old, six feet tall, 180 pounds, numerous tattoos on his arms, long hair worn in a ponytail.  [*Id.* at 50-51]. In the last call to Detective Gassman, at approximately 11:30 p.m. [*id.* at 73], the informant stated that "David" would be at a particular 7-Eleven convenience store in Denver at approximately midnight to conduct a narcotics transaction.  Additionally, the informant stated that "David" would be driving the previously described red car with the broken glass and that, if approached, "David" would produce false identification in the name of Jeffrey Meehan. [*Id.* at 51-52].

Detective Gassman began surveillance of the parking lot of the convenience store shortly before midnight. [*Id.* at 52]. At approximately 12:30 a.m., on June 24, 2003, Detective Gassman saw a small red car matching the description given by the

confidential informant enter the parking lot of the convenience store. [*Id.*]. The driver of the car parked it in a well lighted area near the corner of the store and remained in the vehicle as Detective Gassman continued to watch through binoculars. [*Id.* at 52-53]. After several minutes, Detective Gassman drove his own car closely past the parked red car and observed that the driver was a tall white male of the approximate age predicted by the informant, with long hair tied back in a ponytail and tattoos on his arms. [*Id.* at 53, 76]. Detective Gassman also saw that the red car had broken glass as described by the confidential informant. [*Id.* at 53, 76].

Satisfied that this was the individual whom the confidential informant described as being wanted for escape, Detective Gassman radioed for a uniformed police officer to make contact with the driver of the red car and relayed to other officers information that the driver of the red car was possibly wanted for escape and was possibly armed and dangerous. [*Id.* at 54-55, 79, 89, 97, 100]. Officer Jackson arrived at the scene within a few minutes, parked his patrol car near the red car, approached the driver of the red car, and requested identification. [*Id.* at 54]. The driver of the red car produced a New Mexico driver's license in the name of Jeffrey Meehan. [*Id.*]. With this last bit of corroboration of the information from the confidential informant, Detective Gassman told other uniformed officers who had arrived on the scene to remove the driver from the car and "to pat him down for officer safety purposes." [*Id.* at 55]. Officer Vasquez removed the driver from the red car, handcuffed him, and patted him down for weapons. [*Id.* at 55, 82, 86-87, 99] During the pat-down, Officer Vasquez discovered a syringe in the driver's sock, the possession of which is a violation of the Denver municipal code. [*Id.* at 73]. As the driver was being patted down for weapons, Detective Gassman looked into

the car through the open driver's door and saw, in plain view, the barrel of a .357 caliber handgun protruding from underneath the driver's seat and a scale lying on the floorboard in front of the driver's seat. [*Id.* at 55-58, 68-69]. The driver, who was later identified as David Leroy Hartman, the defendant-movant, continued to insist that he was Jeffrey Meehan. [*Id.* at 67-68]. A search of the car incident to Mr. Hartman's arrest produced documents bearing the name of David Hartman, substantial quantities of methamphetamine and cocaine base (crack). [*Id.* at 59-63], a box of ammunition on the console, and a speed loader for the handgun on passenger seat.[3] Mr. Hartman was detained for the officers to confirm the existence of a felony warrant. [*Id.* at 101]. After learning Mr. Hartman's true identity and surname, it was confirmed that there was a valid warrant for his arrest (albeit for a parole violation, not for escape). [*Id.* at 61-63].

On December 3, 2003, a federal grand jury returned a three-count Indictment, charging Mr. Hartman as follows: Count I – Possession of a Firearm by a Previously Convicted Felon, in violation of 18 U.S.C. §§ 922(g)(1); Count II – Possession of Ammunition by a Previously Convicted Felon, in violation of 18 U.S.C. §§ 922(g)(1); and Count III – Possession of an Unauthorized Military Identification Card, in violation of 18 U.S.C. § 499.

On May 20, 2004, prior to trial and motions hearing, Mr. Hartman advised me of problems he was having with his retained counsel, C. Bradley Calbo, Esq., who was then the subject of state bar grievance proceedings and requested the appointment of another attorney to represent him. [#17]. In response, on June 1, 2004, I appointed the

---

[3] The evidence of ammunition and speed loader within the sight and easy reach of Mr. Hartman undercuts his claim that he did not know that the handgun right under his feet under the driver's seat was even in the car.

Federal Public Defender to represent Mr. Hartman. [#21]. Assistant Federal Public Defender, Ann England, entered her appearance on June 7, 2004, [#23], and thereafter represented Mr. Hartman in the pretrial, trial, and sentencing proceedings before this court.

On July 26, 2004, the grand jury returned a six-count Superseding Indictment, charging Mr. Hartman as follows: Count One – Possession of a Firearm by a Previously Convicted Felon, in violation of 18 U.S.C. §§ 922(g)(1) and 924(e)(2); Count Two – Possession with Intent to Distribute a Controlled Substance (Cocaine Base), in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(D); Count Three – Possession with Intent to Distribute a Controlled Substance (Methamphetamine), in violation of 21 U.S.C. § 841(a)(1) and (b)(1)(D); Count Four – Possession of a Firearm in Furtherance of a Federal Drug Trafficking Crime, in violation of 18 U.S.C. § 924(c)(1)(A); Count Five – Possession of an Unauthorized Military Identification Card, in violation of 18 U.S.C. § 499; and Count Six – Use of Another's Identification to Commit Unlawful Activity, in violation of 18 U.S.C. § 1028(a)(7) and (b)(3). [#32]. Thus, the Superseding Indictment excluded Count II – Possession of Ammunition by a Previously Convicted Felon, which was charged in the first indictment, and added Counts Two, Three, Four, and Five, which were not charged in the first indictment.

Prior to the return of the Superseding Indictment, Mr. Hartman had filed a variety of pretrial motions, including a Motion to Suppress Illegal Stop and Search and the Fruits of that Search [#27] and a Motion for Sanctions for Failure to Preserve Material Evidence [#29]. Following the return of the Superseding Indictment, Mr. Hartman filed additional pretrial motions, including a Motion to Dismiss Count V of the Superseding

Indictment for Failure to State an Offense [#46] and a Motion for Severance of Counts I, II, III, IV from Counts V and VI [#48]. Following an evidentiary hearing on August 30, 2004, I denied the Motion for Sanctions for Failure to Preserve Material Evidence [Hrg. Tr. 8/30/2004 at 40-47], denied the Motion to Dismiss Count V [#56], denied the Motion for Severance of Counts I, II, III, IV from Counts V and VI [#54], and ordered additional briefing by the parties on the motion to suppress, Hrg. Tr. 8/30/2004 [#50 at 104-05]; [#52]. Subsequently, on September 14, 2004, I also denied the motion to suppress. [#61].

On October 21, 2004, the government by written motion, [#68], moved to dismiss Count Five of the Superseding Indictment – Possession of an Unauthorized Military Identification Card, in violation of 18 U.S.C. § 499. Accordingly, Count Five was dismissed by order entered the following day [#70]. Trial by jury commenced on November 1, 2004, and ended on November 4, 2004. The jury returned verdicts finding Mr. Hartman guilty of all five remaining counts as charged in the Superseding Indictment. [#86].

At the sentencing hearing on January 28, 2005, I granted Mr. Hartman's motion for downward departure under USSG §§5K2.0 and 5K2.13 from the guideline range of 262 to 327 months (based on an offense level of 34 and a criminal history category of VI) and imposed sentences of imprisonment as follows: concurrent terms of 180 months on Counts One, Two, and Six; a term of 12 months on Count Three, to run concurrently with the terms imposed in Counts One, Two, and Six; and a term of 60 months on Count Four, to run consecutively to the other terms imposed. [#105], for a

total sentence of 240 months, or 20 years.[4] The sentence of 180 months on Count One represented the mandatory minimum. The sentence of 60 months on Count Four represented the mandatory minimum, which was required to be imposed and served consecutively to the sentences imposed on all other counts of conviction.

Mr. Hartman appealed from the judgment of this court, assigning error to my (1) denial of his motion to suppress; (2) denial of his motion to sever counts; (3) denial of his motion for sanctions for the destruction of evidence; and (4) denial of his anticipatory objection to the reliability of an expert witness concerning his mental state.[5] *See United States v. Hartman*, 194 Fed. Appx. 537, 2006 WL 2567800 (10th Cir., Sept. 7, 2006) (unpublished).  The judgment of this court was affirmed on September 6, 2006.  *Id.*

## PROCEDURAL HISTORY OF § 2255 MOTION

On September 10, 2007, Mr. Hartman filed his motion to proceed *in forma pauperis* and motion pursuant to 28 U.S.C. § 2255 collaterally attacking the judgment of this court.[6] Mr. Hartman raised four claims in his § 2255 motion:

- **Claim One:**  that the United States Court of Appeals for the Tenth Circuit erred in affirming on appeal this court's denial of his motion to suppress;

- **Claim Two:**  that the United States Court of Appeals for the Tenth Circuit erred in affirming on appeal this court's denial of his motion to sever

---

[4] I note that the sentence of 20 years corresponded with the mandatory minimum sentence that Ms. England and Mr. Hartman discussed at the time they discussed the risks associated with rejecting the plea agreement and proceeding to trial.

[5] Mr. Hartman did not impugn any aspect of sentencing on direct appeal.

[6]  The motion to vacate appears to have been signed by Mr. Hartman (who was incarcerated) on September 4, 2007, and mailed in an envelope bearing a postmark of September 5, 2007.

counts; and

- **Claim Three:** that he received ineffective assistance from his appointed trial counsel because she (1) did not receive from Mr. Calbo, Mr. Hartman's quondam retained counsel, discovery and other documents, including investigation reports, medical records, third party statements concerning the ownership of a vehicle and its contents, and notes; (2) "failed to have Attorney Calbo held in contempt" after being served with a subpoena which required the production of discovery previously provided by the government; and (3) incorrectly and insufficiently advised Mr. Hartman in an unspecified way about the consequences of "not accepting a plea bargain"; and

- **Claim Four:** that he was improperly convicted and sentenced because (1) a witness stated on cross-examination that he and other witnesses had been "coached" in their testimony in an unspecified way; (2) a jury did not specifically find, for purposes of sentencing, whether the substance found during Movant's arrest was cocaine powder or cocaine base as purportedly required by *Apprendi v. New Jersey*, 530 U.S. 466 (2000); and (3) the prosecutor and government agents interviewed defense witnesses before the trial and improperly withheld from Mr. Hartman unspecified "exculpatory evidence, which could have exonerated" Mr. Hartman in some unspecified way.

In the **Amended Orders Re: Defendant's Motion Under 28 U.S.C. § 2255 To Vacate, Set Aside, or Correct Sentence By a Person in Federal Custody** [#162]

entered October 4, 2010, Mr. Hartman's Claims One, Two, and Four were determined to be barred procedurally from collateral attack under § 2255. Additionally, Claims One and Two, which had been adjudicated on direct appeal by the United States Court of Appeals for the Tenth Circuit and, therefore, were determined to be barred from collateral attack as the law of the case and under the doctrine of res judicata. The extant orders of this court concerning those claims remain in tact and unchanged. Mr. Hartman's remaining Claim Three for ineffective assistance of counsel was found to be without merit, primarily for lack of factual circumstantiation.

However, in truly an act of judicial munificence,[7] I entered an **Order Granting Motion To Reconsider** [#178] on February 28, 2011, which provided, *inter alia*, that **Defendant's Motion To Reconsider** [#164] filed December 3, 2010, is **GRANTED**, but only as to the claim of effective assistance of counsel. Order [#178 at 1, ¶ 1]. I received evidence and argument on this discreet claim on June 23, 2011. [#188].

## LEGAL STANDARDS

To establish a claim of ineffective assistance of counsel, a Mr. Hartman must show (1) that his counsel's performance fell below the constitutional minimum guaranteed by the Sixth Amendment, that is, "an objective standard of reasonableness," and (2) that his counsel's errors prejudiced him, that is, "were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington*, 466 U.S. 668, 687-88, 690 (1984). Prejudice is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

---

[7] I certainly was not required to consider facts asserted and arguments raised for the first time in the reply.

*Id.* at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome."  *Id.*  In order to demonstrate prejudice, a movant under 28 U.S.C. § 2255 must establish that counsel's performance rendered the proceedings "fundamentally unfair or unreliable."  *Lockhart v. Fretwell*, 506 U.S. 364, 369 (1993).  A court may not set aside a conviction or a sentence solely because the outcome would have been different absent counsel's deficient performance."  *Id.* at 369-70.

Counsel's performance is judged on a reasonableness standard, viewing all circumstances at the time when the conduct occurred.  *Strickland*, 466 U.S. at 690; *United States v. Smith*, 10 F.3d 724, 728 (10th Cir. 1993).  There is a strong presumption that counsel's performance was not ineffective and "'f[ell] within the wide range of reasonable professional assistance.'"  *United States v. Clonts*, 966 F.2d 1366, 1370 (10th Cir. 1992) (quoting *Strickland*, 466 U.S. at 689).  To overcome this strong presumption, a Mr. Hartman "must shoulder a heavy burden."  *Catches v. United States*, 582 F.2d 453, 457 (8th Cir. 1978).  The Supreme Court has recognized that

> [t]here is a <u>strong presumption</u> that counsel's performance falls within the wide range of professional assistance, . . . the defendant bears the burden of proving that counsel's representation was unreasonable under prevailing professional norms and that the challenged action was not sound strategy. The reasonableness of counsel's performance is to be evaluated <u>from counsel's perspective at the time of the alleged error</u> and in light of all the circumstances, and the standard of review is highly deferential.

*Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986) (citations omitted) (emphasis added).

If  Mr. Hartman fails to satisfy either prong of the *Strickland* test, his ineffective assistance of counsel claim must fail.  *See Strickland*, 466 U.S. at 697

**DISCUSSION**

The claim of ineffective assistance of counsel by the Mr. Hartman has evolved over time. In the § 2255 motion, [#129], the claim was conclusory only. When the obvious lack of circumstantiation and ratiocination was emphasized by the government in its response, [#138], Mr. Hartman used his reply,[8] [#142], to attempt to fill in the factual blanks created by the lack of factual specificity in his motion and to abandon that portion of his claim relating to the interaction, *vel non*, of Ms. England with Mr. Calbo, Mr. Hartman's original, retained counsel.[9] Finally, his claim was reshaped by his counsel in the hearing on the motion on June 23, 2011.

### The claim as explained and presented at the hearing

At the hearing on June 23, 2011, the attorney for Mr. Hartman distilled the position of the Mr. Hartman to two arguments in his opening statement: (1) that prior to the filing of the superseding indictment, the government made an offer that the Mr. Hartman did not accept because ". . . he received bad – poor – advice from his counsel and that amounted to ineffective assistance of counsel; and (2) that the mentation of the Mr. Hartman at this critical time affected adversely his ability to communicate with his attorney.[10] Neither claim is supported by the evidence educed during the hearing or in the record otherwise. In fact, the existing evidence is to the contrary.

---

[8] The actual title of this paper is **Memorandum in Support of Section 2255 Petition**. [#142].

[9] To the extent, if any, that Mr. Hartman persists in that portion of his claim of ineffective assistance of counsel by Ms. England for her alleged failure to retrieve discovery and work product from Mr. Calbo and/or her alleged failure to bring and prosecute contempt of court charges against Mr. Calbo, I approve, adopt, and incorporate my consideration and resolution of those discreet issues in my **Amended Orders Re: Defendant's Motion Under 28 U.S.C. § 2255 To Vacate, Set Aside, or Correct Sentence By a Person in Federal Custody** [#162] at 12-13, entered October 4, 2010.

[10] It is, indeed, noteworthy, if not telling, that neither Mr. Hartman nor his current attorney, Robert S. Berger, Esq., ever claim expressly that Mr. Hartman was legally incompetent at any time relevant to his claim that Ms. England was ineffective.

Two witnesses testified at the hearing on June 23, 2011, Ms. England and Mr. Hartman. Both were called on behalf of Mr. Hartman. In assessing the credibility of Ms. England and Mr. Hartman, I considered all facts and circumstances shown by the evidence that affected the credibility of each of them, including the following: the means of knowledge for each witness, his or her ability to observe, and his or her strength of memory; the manner in which each might be affected by the outcome of the hearing; the relationship each has or had to either the government or the defense; and the extent to which each was either supported or contradicted by other evidence presented during the hearing or extant in the record.

After observing and listening to each witness as each testified, I find Ms. England to be the most credible and to have the best memory of relevant events.

### The evidence presented at the hearing

On June 7, 2004, Ann England, then a deputy federal public defender, entered her appearance as counsel for Mr. Hartman. *See* [#23]. Very shortly after entering her appearance, Ms. England received discovery from the government and a proposed written plea agreement. Joshua Stein, the assistant United States attorney (AUSA) who was prosecuting the case, told Ms. England that if the Mr. Hartman did not accept the plea offer by the time the government called its first witness at the first motions hearing, the plea offer would be "off the table."[11] Additionally, AUSA Stein advised Ms. England that if Mr. Hartman did not plead, the government would seek a superseding indictment in which Mr. Hartman would be charged, *inter alia*, with a violation of 18 U.S.C. §

---

[11] Although Ms. England recalled that the relevant motions hearing was set then for July 6, 2004, the CM/ECF system shows that the motions hearing was set for July 28, 2004. [#26]. July 6, 2004, was the deadline by which pretrial motions were to be filed. [#26].

924(c), which on conviction would expose Mr. Hartman to a minimum mandatory consecutive sentence of not less than five years.

Ms. England first met with Mr. Hartman on or near June 7, 2004. Mr. Hartman, from day one, emphatically professed his innocence to possessing the handgun found in the car he was driving at the time of his arrest. His continuing claim is that he is actually innocent of possessing a firearm in violation of 18 U.S.C. § 922(g)(1) (Count I in the original Indictment and Count One in the Superseding Indictment), that the firearm belonged to someone else, and that he was not even aware of its existence until it was discovered by the police in the car at the time of his arrest.

Between their first meeting and July 6, 2004, Ms. England met with Mr. Hartman six or seven times. Additionally, Stan Peebles, Ms. England's investigator, met with Mr. Hartman at least twice in that same time period. This flurry of activity was necessary to complete the pretrial investigation and preparation necessary to be ready for trial, which had been set on June 28, 2004, to commence August 16, 2004. [#26].

Nearly from the beginning of her representation of Mr. Hartman, Ms. England was aware that Mr. Hartman had a history of mental illness. Accordingly, early on in her representation of Mr. Hartman, Ms. England obtained the waivers necessary to retrieve his mental health records from the Colorado Department of Corrections, where most of the significant treatment had occurred, and a facility that provided treatment to Mr. Hartman while he was on parole. Ms. England received and reviewed those mental health records. Notwithstanding, she found Mr. Hartman to be smart and articulate; he was "rational, but pretty emotional." On the issue of competency, I find the following testimony of Ms. England on examination of AUSA James Hearty to be credible and

13

cogent:

Q   Mr. Berger asked you, did you consider competency issues with regard to Mr. Hartman?

A   No.

Q   And your answer is no, you did not consider competency issues?

A   Right.

Q   Why not?

A   Competency is a very different standard than whether someone is mentally ill. There are many mentally ill people who are competent.  The level for competency is very low.  Somebody has to be able to not assist their counsel in their defense and not understand what is going on, and I didn't see that in Mr. Hartman.

Q   In your experience prior to being a Federal Public Defender, did you have experience with competency issues and clients who possibly were incompetent or, at least, you were concerned may have been incompetent?

A   Yes.

Q   Could you give the court some sense of what your experience was in dealing with competency issues prior to your representation of Mr. Hartman?

A   Well, we represented lots and lots of people at a time obviously as a state public defender. I would raise competency on numerous cases, and we litigated competency prior to this in terms of getting private psychologists, psychiatrists to evaluate people when I felt there were real competency issues.  So this was also an option we could hire somebody to do that if we felt it.  In terms of confidentiality, we want to keep what they said confidential. But truly interacting with someone who is incompetent was very different from Mr. Hartman.  I am still a practicing attorney, and I have a case now that the person is  incompetent, and we are litigating that now, and it's very evident.

Q   During the time period of the plea negotiations, so prior to trial and prior to the Superseding Indictment, you met with Mr. Hartman many times; is that right?

A   Yeah.

Q   And in those meetings did you find Mr. Hartman's thinking to be clear?

A   Sure.  Like I said, he is an emotional person, and he was emotional, and I think that can be affected by his mental illness, but he is smart and interested in what's going on. He relied on his wife quite a bit and had allowed me to talk with her about it, so he would include her in some of it to

14

help him reason out, but that's very common for clients
facing significant sentences to find someone else to help
them figure out what to do as well.

Q   The legal standard is he understood the nature and
consequences of the proceedings, correct?

A   Right.

Q   And did you believe that Mr. Hartman understood the
nature and consequences of the proceedings?

A   Yes.

Q   Was it a close call to you at all?

A   No.

Q   Was Mr. Hartman's thinking rational?

A   Yeah.  Like I said, he was a very factual-drive case.  So
he gave us –  I can look back on my notes – dates, times,
places, very specific information that he wanted us to do for
him in terms of investigation and that's just evident that he
was thinking clearly about what had happened and what
was going on and what he wanted.

Q   That's also evidence that he was able to assist in his
own defense, correct?

A   Yeah.  Very much so.  He was very involved in the
investigation of this case.

Q   And based on your experience and your interaction with
Mr. Hartman, did it appear to you that he understood the
risk of rejecting the government's plea offer and going to
trial?

A   I believe so, yeah.

Based on her considerable experience as a criminal defense attorney, her review

of Mr. Hartman's mental health records, and her numerous interactions with and

observations of him, Ms. England considered Mr. Hartman to be competent.[12] Her

conclusion was, indeed, reasonable. Thus, reasonably she did not request a

competency examination or pursue a claim of incompetency.

Notwithstanding his claim of actual innocence, the plea agreement offered by the

government required a plea of guilty to Count I, the § 922(g)(1) gun charge, which,

_____

[12] Although as of June, 2004, Ms. England had been a deputy federal public defender for only a
short time – several months– and was facing her first trial in federal court, she had been a deputy state
public defender for the previous nine years during which tenure she had tried 100 to 150 cases to a jury.

according to the government's sentencing calculations, would result in a sentencing range of 70 to 87 months of imprisonment. Ms. England conducted an independent analysis of the then mandatory sentencing guidelines and concluded correctly that the sentencing analysis of the government was flawed because it did not reflect that Mr. Hartman was an armed career criminal subject to a mandatory minimum sentence of 15 years, or 180 months. Thus, Ms. England advised Mr. Hartman early on that if he accepted the plea agreement, the sentencing range would not be 70 to 87 months as calculated incorrectly by the government, but, instead, would be not less than 180 months, and, indeed, was likely to be closer to 360 months – 30 years. Mr Hartman understood. Ms. England also advised Mr. Hartman that if he did not accept the plea agreement – even though flawed – the government planned to seek a superseding indictment, which would charge, *inter alia*, an alleged violation of 18 U.S.C. § 924(c), and a related drug charge, which on conviction would result in a mandatory minimum consecutive sentence of not less than five additional years. Again, Mr. Hartman understood.

Ms. England directed the attention of AUSA Stein to the incorrectly calculated sentencing range in the proposed plea agreement and inquired whether the government would consider a downward departure for substantial assistance based on information known to Mr. Hartman. Mr. Stein responded that if Mr. Hartman pled guilty as contemplated by the proposed plea agreement, he could then debrief, and the government would decide then – and not before – whether the information was of sufficient value to the government to warrant the filing of a motion for downward departure for substantial assistance under USSG §5K1.1. Thus, the prospects of a

revised plea agreement with a sentence of less than – let alone, significantly less than – the mandatory minimum of 15 years was speculative.

Ms. England discussed the proposed plea agreement carefully and thoroughly with Mr. Hartman and his wife, who was especially helpful to Ms. England and influential with Mr. Hartman. In her discussion with Mr. Hartman of the essential elements required by law for the commission and conviction of 18 U.S.C. § 922(g)(1), Ms. England did not advise Mr. Hartman that the government would be required to prove that he both possessed and brandished the firearm. In her discussion with Mr. Hartman of the essential elements required by law for the commission and conviction of 18 U.S.C. § 924(c)(1)(A), Ms. England did discuss with Mr. Hartman the enhanced penalty associated with brandishing a firearm under § 924(c)(A)(1)(ii). Ms. England discussed also the consequences of a conviction under § 924(c) carefully and thoroughly with Mr. Hartman and his wife.[13] The record does not disclose any reasonable basis on which Mr. Hartman would have conflated the concept of brandishing under § 924(c)(A)(1)(ii) and the essential elements for possession of a firearm by a prohibited person under § 922(g)(1), which essential elements do not require anything more than actual or

_____

[13] In his papers Mr. Hartman claimed that Ms. England advised him of an offense under § 922(j), *i.e.*, Possession of a Stolen Firearm, as opposed to § 924(c). I discounted this testimony because Mr. Hartman was not charged in either indictment with a violation of 18 U.S.C. § 922(j), and Ms England testified credibly that she never discussed § 922(j) with Mr. Hartman. During his testimony Mr. Hartman thought that he recalled Ms. England discussing 18 U.S.C. § 924(e), not § 924(c). However, Ms. England testified credibly that they discussed the mandatory minimum sentence of 15 years that must be imposed on an armed career criminal – which sentence is required under 18 U.S.C. § 924(e)(1) – and the mandatory minimum consecutive sentence that must be imposed for a conviction of 18 U.S.C. § 924(c)(1)(A). Thus, I find that Ms. England advised Mr. Hartman both of the mandatory minimum sentence required under 18 U.S.C. § 924(e)(1) for an armed career criminal who violates 18 U.S.C. § 922(g), and the mandatory minimum sentence required under 18 U.S.C. § 924(c)(1)(A)(I) for a person who is convicted under 18 U.S.C. § 924(c). To the extent Mr. Hartman was confused either then or now, his confusion was and is not the result of diminished mentation at the time of the advisement or the result of an improper, inaccurate, or incomplete advisement by Ms. England.

constructive possession of a firearm by a convicted felon.

Concerning both the § 922(g)(1) and § 924(c) gun charges, Ms. England believed reasonably that Mr. Hartman had a credible defense – "a fairly strong case." Concerning the § 922(g)(1) charge, the government must prove, *inter alia*, that Mr. Hartman possessed the firearm, a fact that Mr. Hartman denied vehemently, and concerning the § 924(c) charge, the government must prove, *inter alia*, that Mr. Hartman committed a drug trafficking crime by the use of a deadly or dangerous weapon, a fact that Mr. Hartman also denied vehemently.[14]

In the end, the combination of Mr. Hartman's claim of actual innocence to any gun charge, the problematic nature of the incorrect sentencing range in the initial plea agreement, the speculative nature of debriefing with the government in the hopes of a better deal, the opinion of Ms. England that any gun charge was defensible at trial, and the difference between a 15 year sentence via plea agreement and a 20 year sentence[15] if convicted of both the § 922(g)(1) and the § 924(c) gun charges at trial, led Mr. Hartman reasonably to reject the plea agreement and to take his chances at trial. Mr Hartman made this fateful decision competently, voluntarily, and knowingly after several thorough discussions and reviews of the advantages and disadvantages, including most

---

[14] *See* 18 U.S.C. § 922(g)(1) and 18 U.S.C. § 924(c)(1)(A), respectively, for the relevant essential elements.

[15] This part of the sentencing calculus focused on a sentence of 70 to 87 months for a conviction under 922(g)(1) under the incorrectly calculated sentencing range in the plea agreement versus a sentence of 180 months as an armed career criminal – a difference of 80 to 93 months – versus the difference between 180 months for a conviction under just 922(g)(1) and 240 months for a conviction also under 924(c) – a difference of only 60 months. Thus, the relevant comparison for Mr. Hartman focused on the difference between an extra 60 months if he went to trial and lost versus an additional 80 to 93 months if he accepted the plea agreement with its erroneous sentencing range which, *per force*, would be corrected during the presentence investigation and sentencing process.

prominently the risks associated with a trial on the existing charges and the likely charges, should he reject the plea agreement. There is no credible evidence that his pivotal decision to reject the proposed plea agreement was the result of a lack of competence on the part of Mr. Hartman or Ms. England.

True to his word, AUSA Stein then sought and obtained a superseding indictment. In the six-count Superseding Indictment Mr. Hartman was charged as promised in Count Four with Possession of a Firearm in Furtherance of a Federal Drug Trafficking Crime, 18 U.S.C. § 924(c)(1)(A). As Ms. England had explained already, for Mr. Hartman a conviction on Count Four would result in a mandatory minimum sentence of 240 months, or 20 years.[16]

The evidence indicates that both Mr. Hartman and Ms. England were surprised ed by some of the crimes charged in the Superseding Indictment. Neither was surprised, nor could they have been, by the § 924(c) charge in Count Four (and the related drug offense charged in Count Two), the promise or threat of which was disclosed and discussed many times during the many discussions Ms. England had with Mr. Hartman before he rejected the plea offer of the government. The evidence indicates that both were surprised by Count Three, which charged Possession with Intent To Distribute Methamphetamine, because of the relatively small amount of methamphetamine in the possession of Mr. Hartman at the time of his arrest. Ms. England was surprised also by "the additional document charges," a reference apparently to Count Six, which charged the Use of Another's Identification To Commit

---

[16] 15 years as an armed career criminal and an additional five years (which must be served consecutively) for the 924(c) violation.

Unlawful Activity, 18 U.S.C. § 1028(a)(7) and (b)(3). Ms. England was surprised further by the timing of the filing of the Superseding Indictment, which filing came well after the time anticipated by Ms. England. However, neither Mr. Hartman nor Ms. England were surprised by the addition of Count Four and Count Two – the 924(c) charge and the related drug charge. These charges were expected. None of the other charges that were added in the Superseding Indictment was directly relevant to their previous discussions about the government's plea offer that Mr. Hartman ultimately rejected.

## CONCLUSION

Based on the foregoing facts, law, and analysis, I conclude ultimately (1) that Ms. England was aware of and considered carefully the mental health, including the competency of Mr. Hartman, as she interacted with him professionally; (2) that in her consideration of Mr. Hartman's mental health generally and his competency specifically, Ms England had the benefit, *inter alia*, of her firsthand observations of Mr. Hartman on the many occasions when she met with him to discuss his case, the proposed plea agreement, and his defense and her review of the mental health records that she requested and received from the Colorado Department of Corrections; (3) that at the time Mr. Hartman rejected the plea agreement offered by the government and elected to proceed to trial, Ms. England concluded reasonably that Mr. Hartman was competent; (4) that Ms. England provided Mr. Hartman with timely, relevant, complete, accurate, and competent legal advice concerning the proposed plea agreement, including its relative advantages and disadvantages, and the risks of a trial, which would likely include the serious additional charges threatened by the government; (5) that Mr. Hartman has wholly failed to establish that but for Ms. England's alleged incompetent

advice about the proposed plea agreement, he would have accepted the plea agreement; (6) that viewing all the circumstances at the time when the conduct occurred, the performance of Ms. England was objectively reasonable and effective and that Mr. Hartman suffered no prejudice – let alone actual prejudice – from the professional conduct of Ms. England; (7) that Mr. Hartman's claim of ineffective assistance of counsel should be denied; and (8) that the extant denial otherwise of his motion under 28 U.S.C. § 2255 should be homologated. In short, Mr. Hartman has failed to establish either the deficient performance or prejudice prong of ***Strickland***. Accordingly, appropriate orders should be entered.

## ORDERS

**THEREFORE, IT IS ORDERED** as follows:

1.  That the **Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody** [#129] filed September 10, 2007, by the Mr. Hartman is **DENIED**;

2.  That concerning the other claims asserted in the motion [#129], the findings of fact, conclusions of law, and orders entered in the **Amended Orders Re: Defendant's Motion Under 28 U.S.C. § 2255 To Vacate, Set Aside, or Correct Sentence By a Person in Federal Custody** [#162] entered October 4, 2010, are **RATIFIED** and **REAFFIRMED**; and

3.  That there is no basis on which to issue a certificate of appealability pursuant to 28 U.S.C. § 2253(c).

Dated September 22, 2011, at Denver, Colorado.

**BY THE COURT:**

Robert E. Blackburn
United States District Judge